The second case on our call is agenda number two one zero eight four four one people versus Samuel Absher pellet thank you your honor may it please the court I'm assistant attorney general Eric Levin on behalf of the people of the state of Illinois when the defendant pled guilty in 2004 to a charge of felony retail theft he was sentenced to two years of probation the trial court ordered that the first year of that probation would be served as what's called intensive probation supervision this is essentially an intermediate sanction that courts often impose that it's between in between a prison term and ordinary probation let me ask you right there is this a statutory creation intensive probation or is it a type of probation where the court adds additional conditions excuse it is not a statutory term it is as we explained in our brief Illinois's probation system is essentially very decentralized and judge-centric so there are certain terms that automatically apply to all probationers just by virtue of being on discretion if it finds that they're reasonably related to either the defendant's crime or to his background in terms of what he'll need to be to properly be rehabilitated this statute also allows for any other reasonable condition that the judge feels is necessary on those grounds and often what is imposed in these cases where a judge believes that we have a high-risk criminal offender who perhaps doesn't necessarily need to be in prison but who nevertheless would pose an especially high risk to the community were he to remain on probation judges often impose intensive probation supervision the hallmark of which is a search condition like we have in this case so it's by practice it's my practice this is when you determine intensive probation is by practice the court confession anyway and you're suggesting do you have any in the record that this specific waiver of rights etc is uniformly used across the state I don't have any evidence in that regard what I what I can say is that the term intensive probation supervision itself and the general theory behind it it comes from the literature and criminology and sociology so it it is a recognized practice across the nation in fact and I don't know I don't have the statistics on how often it's imposed but we do know from the cases that even as far back as United States versus Knights in California that was I believe 1991 we had a similar condition imposed and I know that many probation counties have in St. Clair County in this case in particular even has an intensive probation supervision department within the probation office so I believe it is a fairly common or at least regular type of probation that's imposed I see mr. Levin that you acknowledge that this court in Lampet declined to uphold the probation search at issue under the special need doctrine because probation searches in Illinois were not subject to administrative regulations in contrast to those in Griffin and the Illinois probation order search conditions did not require searches to be supported by reasonable grounds I mean you acknowledge that so are you asking are you taking the position that Wilson overruled lamp attack in some way or I'm trying to understand your position on that certainly and maybe if I step back for a second there our position is there are three independent grounds on which the court can affirm or uphold the search in this case even if it was suspicionless we have the the Fourth Amendment general balancing test and that's what the court applied in Sampson and then this court applied in Wilson that's separate from special needs I just under general Fourth Amendment balancing principles and I would suggest that might be the easiest way for the court to uphold the search here because that's what do we do with Sampson having found a difference between parolees and probation well I think what's important in in both Lampet talk and then later in Sampson and Wilson where the court discussed the differences between probationers and parolees it was done in the abstract there was no there was no specific analysis of intensive probation supervision and as we as we set out in our reply brief in particular also in the opening brief but in the reply brief in particular at pages four and five we lay out the the conditions of parole that were at issue in Sampson and contrast their compare them with the conditions of intensive probation supervision to which this defendant was subject and they are virtually identical if anything the conditions of the defendants intensive probation supervision were more restrictive than the conditions of parole at issue in Sampson Sampson for instance was restricted in his right to of movement and his right to travel and his right with who he could associate with he was subject to drug testing he was subject to he was prohibited from possessing a weapon and of course he was subject to the search condition may I ask you here though if there was a violation of the parole conditions what would be the next step and how would that compare to a violation of his probation conditions they'd be different wouldn't they well if there's a violation of parole I I believe they the parole can be revoked and the defendant is then made to serve the remainder of his sentence that was left I by comparison if there was a if there's a violation of probation the defendant then can be sentenced the probation is revoked and the defendant can then be sentenced to whatever he could have been sentenced to in the first place so in this case the defendant would have gone back in front of the trial court and it could be a could could have been sentenced on his felony retail theft I think that's actually an important point here but it shows that the this was not a situation where the intensive probation supervision was imposed in lieu of ordinary probation it was imposed in lieu of prison had had the intensive probation supervision not been available for this defendant and for all the high risk defendants who present a special risks to the community of recidivism their alternative would be imprisonment where they would have essentially no Fourth Amendment rights so I think that's important that goes more to the waiver argument which I'll get to in a in a moment and we haven't discussed that yet but I think that is an important point if I can return to Justice Thomas's question as I was saying we have three alternative grounds each one of which would uphold the search in this case one I mentioned the general Fourth Amendment balancing I believe Justice Thomas's question went to the special needs doctrine and it is true that in Lompatak this court while recognizing that the administration of a system of probation presented special needs beyond the normal needs of law enforcement the court nevertheless declined to uphold the search in that case under the special needs doctrine because the Illinois system of probation does not operate the same way as Wisconsin's as we discussed in our brief however we believe that was a misreading of the Griffin special needs doctrine on the one hand the court noted that in Wisconsin search conditions are imposed by administrative regulation whereas in Illinois they're imposed in a decentralized manner by the sentencing court itself however there was no indication in Griffin that the that the application of the special needs doctrine in any way turned on that fact moreover it's also true that in this case the search condition did not contain grounds requiring that the search be based on quote reasonable grounds as it did in in in the Wisconsin system in Griffin it's important to note however that what what the court in Wisconsin found to be reasonable grounds were not did not rise to the level of reasonable suspicion the the court in Griffith made that clear in fact the search there was based solely on on an unverified tip that the probationer quote might have guns in his house the court in Griffith made clear that it could not have upheld that search on the basis of it being on reasonable suspicion it was instead upheld upheld on the special needs doctrine and the special needs doctrine generally generally applies to suspicionless searches for instance it's been applied to suspicionless border searches in Martinez-Fuertes it's been applied to suspicionless road stops to to search for drunk drivers in Michigan versus SITS it's been it's been applied to suspicionless searches to stop motorists to seek information about a recent hit and run Illinois versus Lidster in each of these cases the first question the court asks is does the government have a special need beyond the normal needs of law enforcement all those needs I mentioned and the probation system itself is one of those special needs that this court and Griffin has recognized the next step then is to do a balancing test somewhat similar to the general fourth amendment balancing where the court weighs on the one hand the intrusion on the individual's privacy interests against the special need at stake for the government and its need to carry out these searches so again it ultimately gets us back to a balancing test where we have on the one hand a probationer such as this probationer who was subject to intensive probation supervision who had severely diminished expectations of privacy as I mentioned his expectation of privacy was essentially identical to Sampson's expectation of privacy he was subject to virtually identical conditions including a search condition so then what about the idea if we if we should find reasonable suspicion here would there be any situation where we find that a probation officer did not have reasonable suspicion well yes I mean I as an alternative argument I do believe that in this case there was reasonable suspicion and I don't think a finding that in this case there was a reasonable suspicion would mean that in all cases a probation officer had reasonable suspicion here we know that the probation office now of course in and Sampson I believe it was Sampson noted this that in a probation of parole context where you have an officer who's charged with overseeing a particular probationer often times many of the facts that he knows that form the reasonable suspicion will come from that supervisory relationship so here we know that Officer Chester looked into the probationer's background and saw his extensive drug history knew that he was attending AA and NA meetings and knew that many of his past criminal convictions had been substance abuse related so he starts from that basis but then also he observed his behavior he observed his demeanor that that day at the probation office and those are articulable facts that together with the reasonable inferences that can be drawn from them would lead a prudent probation officer to investigate further now obviously those facts are not going to be enough to establish beyond a reasonable doubt that the defendant had drugs in his house or even I would I would concede they wouldn't be enough to establish probable cause but I would say that there's certainly enough to establish the much lower threshold of reasonable suspicion particularly in a I think it's also important to note here getting back to the distinction between Wisconsin's system in Griffin and Illinois's system it's important to note that while while Wisconsin imposed these conditions on all all probationers just by virtue of the fact that they're on probation and so perhaps therefore felt the need to narrow the condition by including a reasonable grounds language which in practice the court read to to be almost no suspicion at all it was less than reasonable suspicion Illinois on the other hand is has instituted the reasonableness at the other end so rather than applying a condition like this to all probationers just by virtue of the fact that they're on probation as Wisconsin did and indeed as California and Illinois does in the terms of parole here Illinois said we're only going to apply a restrictive condition like this if the trial court finds it reasonably related to the defendant's crime to his rehabilitation potential etc. So in that respect it narrows the scope of a search condition on those grounds and that was something not present in Griffin but that adds a level of reasonableness to Illinois's system. In Sampson the United States Supreme Court discussed how there's a continuum obviously there's the citizen on the street there's the the incarcerated inmate and in that case the parolee. Is there still a continuum or is being on probation the same thing as being on parole? No there's certainly a continuum and in fact even probation itself is a continuum. So probation can range from the unsupervised probation which would be essentially almost like not being on probation at all there are certain restrictions but it's very minimally confining. To the other hand where we have in this case an intensive probation supervision where there are many restrictive conditions so even probation itself is a continuum and and so that's why I think what this demonstrates is the need for courts to examine the particular conditions of a defendant's probation rather than applying just categorical distinctions between probation and parole. So in a case like this where we look at the probation conditions and they are virtually identical to the parole conditions the defendant's reasonable expectations of probation but where the question is what level of what expectation of privacy does the particular probationer have in that sense the expectations of privacy are the same if the conditions are the same. And so here we have a we have a probation an intensive probation supervision that is at the far end of the continuum if not identical to parole very close to it. So would all intensive probation since all intensive probationers be subject to the search just like parolees are you not suggesting there's a case by case analysis? Well again I think the way Illinois structures its probation necessitates a case by case basis because as I mentioned there's not a statutory term intensive probation supervision. We're essentially using that as a shorthand for a term of probation that comes with it very restrictive conditions. And so the hallmark of which as I said is the search condition. So I would agree that in any case where we had a probationer who was subject to a search condition like this and other restrictive conditions on his movement on who he could possess, he was prohibited from possessing weapons, all of these together indicate that that probationer has a diminished expectation of privacy. And so if we have a probationer who is subject to the search condition, again the search in this case depends on there being a search condition in the probation agreement. That's what gives the probation officer the authority to do the search. The question then is is such a search, if done without suspicion, constitutional? And so that's where the court can first look to the general Fourth Amendment balancing test where it would weigh the probationer's severely diminished, if not completely extinguished, expectation of privacy against the very substantial government interest in closely supervising such probationers. Again, Sampson and even Knights and Griffith do a good job of presenting a threat of recidivism, but a high risk probationer has been judged by the court to present an especially high risk. And indeed the statistics we cite in our brief are alarming. Anywhere between 22 and 65 percent of probationers re-offend. And in a case where you have a history of drug abuses, we had here the statistics are even higher. So the government has an overwhelming interest in closely supervising such probationers. And when weighed against the probationer's diminished expectation of privacy, the court in Sampson held that such searches without suspicion are reasonable under the Fourth Amendment. If we find that they are, is there any limit on those searches? There is. And there's an important limit in the search in this case that distinguishes it in a way that favors the reasonableness of it from Sampson. In Sampson and even in Knights, the probation condition allowed for searches not only by the probationer's probation officer, but by any law enforcement officer in the field for even general crime control purposes. That's what happened in Sampson, in Wilson and in Knights. Here we have a more narrowly tailored search condition which allowed for the probationer to be searched only by his probation officer, which I believe cuts in favor of reasonableness both under the general Fourth Amendment balancing test, but also would allow this court to apply the special needs doctrine. Because here we're not talking about a search that was conducted for ordinary law enforcement purposes, but a search that was part and parcel of the defendant's probation itself. It was carried out by a probation officer who did not stand in the same position vis-a-vis the probationer's rehabilitation and essentially shepherding him through his probation period with the goal of seeing to it that he did not re-offend and that he was rehabilitated. And so the court, even the dissent in Sampson, noted that a situation like that lends all the more reasonableness to such searches. Again, in our brief, we also, the third independent grounds on which the court could uphold the search in this case would be on the theory that by accepting the search condition in this case, indeed by affirmatively agreeing to it as part of a fully negotiated guilty plea, the defendant prospectively waived his Fourth Amendment rights. Now, we recognize that the court rejected that argument as well in Lompatak. In the interim, however, the Seventh Circuit, interpreting the very same probation order from the same county, did hold, in a prosecution that then was brought in federal court, did hold that such a search was valid under the consent theory. And we asked the court to reexamine Lompatak in light of that case. Is that the Barnett case? That's the Barnett case. Would you agree that's an anomaly in the federal courts? It is. It's not, it has not been followed by other federal circuits, but it is no, I'm not aware of federal, of courts that have explicitly rejected it. I'm not aware of any cases like that, but I would, I would recommend it just as persuasive authority in terms of that the, here the defendant got the benefit of his bargain. He was allowed to stay out of prison, but by not, by not considering that as a waiver, the state does not get the benefit of its bargain. And essentially, the defendant was allowed to profit from the agreement while the state wasn't. But again, as we mentioned in our brief, the court needn't get to that issue, because the search can be upheld either under general Fourth Amendment balancing or under the special needs doctrine. Thank you. Thank you, Your Honor. Mr. O'Neill. May it please the Court, Counselor. My name is Lawrence O'Neill and I represent Samuel Apsher in this cause. Mr. Apsher, I ask your honors to affirm the Fifth District Appellate Court's decision to reverse the trial court's denial of Apsher's motion to suppress evidence involving the warrantless search of his home. Before I get into my argument, though, I would like to address the distinction between intensive probation and regular probation and the implications of that on this case. Because intensive probation is not statutory, it is really a meaningless term here, because the judge could set the same conditions and call it regular probation, whether the defendant is sentenced to intensive probation or not. And the order of intensive probation varies from county to county, judge to judge. The judge could impose the same conditions that were contained in Mr. Apsher's intensive probation and a regular probation order and just put the name intensive probation above it. Certainly that is not a disciplined constitutional way to approach this. In essence, the State is trying to distinguish this case from Lampetock, because Lampetock found that a probationer has constitutionally protected privacy interests and probation searches must be based upon a reasonable suspicion. However, this distinction regarding intensive and regular probation cannot be supported if there are no statutory definitions or standards upon which to evaluate the differences between intensive and statutory probation. So I ask your honors to find that the intensive probation is meaningless to the analysis here, and Lampetock is still the controlling case, no matter what we call it, intensive probation or regular probation, and Lampetock is a dead end for the State, and that's why they're attempting to distinguish it by intensive probation, but that distinction does not carry water. Mr. O'Neill, then is it meaningless that the defendant consented to the conditions of his probation? Well — I mean, that's what you're actually saying, is that whatever he agrees to, he's just doing it to get on probation. Well, your honor, he did not consent to searches that are not based upon a reasonable suspicion. His probation order indicated that he shall submit to searches on the order of his probation officer. There's a long line of cases, and again, Lampetock is right on the point on this, too, and subsequent cases where the condition in a probation that he shall submit, it does not imply prospective authority to the police officer, probation officer, to conduct the search. So there was no consent for a search without a reasonable suspicion. Is there some other additional language in this, the conditions of probation, that the defendant here also consented to the use of anything seized as evidence in court proceedings? I'm not seeing that language in any of the other cases. How does that play in? Well, your honor, that is the second part of that condition, where the order indicates the defendant shall submit to a search, and then consents. That's all in one sentence. Not just consent to the search, consent to the use of anything seized as evidence in court proceedings. Well, that's the important point, your honor. He did not consent to the search unless there was a reasonable suspicion. I think you have to take that second part as a condition of the first part of that, that the first part did not indicate that he consented to a search. I think the proper way to interpret that is that he consented to the use of that evidence, if the search was conducted upon a reasonable suspicion. That second part, the consent to the use of the evidence in court that are found, is conditioned upon the first part of that sentence. It did not say, I consent to the search. Consequently, he did not agree to the search that was not conducted without a reasonable suspicion. Does the existence of all these intensive probation restrictions or conditions indicate that the defendant is subject to more supervision, and therefore should have lesser expectation of privacy than a regular probationer? No, your honor. Again, we have a series of cases, particularly Lompatak, and they consider similar conditions of probation. None of those cases indicate that this includes any type of diminishment of reasonable expectation of privacy or a consent to a search, unless it is specifically spelled out in the probation order. So the probation order did not state that he consented to a search, and those other conditions that you mentioned, there were similar conditions as in Lompatak, and this court held in Lompatak that still, a probation search not supported by a reasonable suspicion would be unconstitutional under the Fourth Amendment. So those conditions, first of all, they were common, ordinary probation conditions, and secondly, those are the same kind of conditions that this Lompatak court considered. So I would, no, your honor, they were not sufficiently restrictive. Mr. Absher still retained autonomy and privacy, notwithstanding the fact that he had conditions of probation. Now that cuts to the question that if these conditions are so restrictive that his expectations of privacy are so well extinguished, then every probationer would be subject to searches without a reasonable suspicion. So those conditions are not sufficient enough to extinguish his expectation of privacy in this case. There's, again, a counselor discusses Wisconsin v. Griffin, and that's an important case, and it's important to note that the court did not hold that a mere fact that the probation system presents special needs for law enforcement, that a probationer's Fourth Amendment protections are completely terminated. And this is important also in the context of the conditions imposed against Mr. Absher, that the Fourth Amendment protections do not vanish with the invocation of the phrase special needs. A probationer may have a reduced expectation of privacy, but the reduced expectation of privacy is not an extinguished expectation of privacy. So Griffin does not authorize the substantial invasions of a probationer's privacy without any reasonable suspicion of wrongdoing. In fact, Griffin's holding is narrow, as the court found that the probation search was reasonable under the Fourth Amendment because it was conducted with a valid state regulation which permitted warrantless probation searches upon reasonable grounds, a standard which the court found was present based upon a tip. Thus, Griffin, in essence, holds that the probation system presents special needs beyond typical law enforcement, but the special needs does not extinguish a probationer's Fourth Amendment protections and permit suspicionless searches of a probationer's home, but the special needs were met in this particular case. There was another problem with applying the special needs exception to the search of Absher's home here, because the search was not conducted to enforce probation conditions, but was for law enforcement purposes. The United States Supreme Court and U.S. v. Unites held that a special needs exception does not apply when the search is done for law enforcement purposes. In the present case, the search of Absher's home was conducted for probation purposes in that the probation officer, Chester, asked and received the state's attorney's permission to search Absher's residence, and the probation officer, Burkett Rice, was accompanied by two police officers during the forced entry into Absher's home and search, thus indicating that the intent of the search involved law enforcement, not merely the enforcement of probation conditions. But further, there was no special needs to protect the public here, because the probation officers allowed Absher to leave the probation office. The probation officer observed Absher in the morning, and Absher left the probation office, and the search of his house did not occur until 10 o'clock that night. They turned Absher out into the street. If this is not a reasonable suspicion the probation officer had, what type of additional evidence would the officer require to reach the standard you suggest? Well, in this case, specifically, Your Honor, the probation officer did not even speak with Absher at the probation office. The state maintains that there was no supplies available to conduct a blood test, or some other test, a sobriety test, or something along those lines, that would have elevated the suspicion, perhaps. But the facts of this case do not establish the reasonable suspicion based upon what the officer observed. Now, the probation officer also checked Absher's history and saw that he had participated in narcotics anonymous and alcohol anonymous. I would submit to this Court that that is not a sufficient, did not raise the suspicion to a reasonable suspicion in this case. The fact that Absher had attended AA sessions in years past does not suggest, does not provide any type of reasonable suspicion that he was under the influence of alcohol or drugs at that particular time. I have a follow-up question. If police are not allowed to act on search consent forms, is the result likely to be fewer probation sentences and more incarcerations, and is this good? Well, that's a policy argument, Your Honor. And the important point here is that there was no consent provision in Absher's probation order. And I think that that would He didn't sign a consent? No, Your Honor. He signed his probation order, said that he shall submit to searches. And I'm contending that That's not a consent? That's not a consent, Your Honor. That's not a consent. They shall submit, this Court, in Lampetock, and it indicates clearly that that shall submit requires that, it leaves the compliance with the request to search dependent upon The Court's back to this reasonable suspicion. That's the only way that this search is constitutional. Yes, we're back to the reasonable suspicion. If the facts presented a reasonable suspicion to Probation Officer Chester that the defendant had violated, that Absher had violated the terms of his probation, the Probation Officer should have acted on it right there at the probation office, perhaps. And the fact that he didn't suggests that there was no reasonable suspicion of probation violation at the probation office. Counselor? Yes, Your Honor. Was the language in Lampetock different? In the search condition? You said it was a consent. You just referenced that he shall submit. Was the language in Lampetock different? The only way it was different is in that second clause that Your Honor mentioned earlier about providing consent. That's the only consent that is in Mr. Absher's probation order, Your Honor, that he consent to the admission of evidence that is discovered during a search. But the first part of that, again, and I hope, I don't know how clear that was, but the first part of it was still he shall submit. Now that does not provide the consent to conduct the search where the evidence is subsequently found. So I think that those two clauses have to be looked at separately. Shall submit is not consent. If the police have, or the Probation Officer has a reasonable suspicion to search his residence and that evidence is found, I think that's when that second half of that statement in the probation, that probation condition would kick in and then that would be the consent to allow that based upon a reasonable suspicion. That's the only way to put that sentence together because clearly this court in Lampetock held that shall submit is not a consent to search. At the hearing in the trial court, the judge, well not the judge, well the judge did deny the motion to suppress. Correct. And there was testimony by Mr. Chester? No, there was not. There was testimony, well? I thought he testified. Yes, he testified. I'm sorry, I was thinking of the officer who conducted the search, Mr. Burkett. No, yes, Officer Chester testified. He testified to his observation of the dilation of the eyes, acting erratically and pacing around the office and I think those were the three key facts, right?  Did the trial court reference those in the finding? Or make those as findings? That's, my understanding is not specifically making findings on that, Your Honor, just mis-made the ruling. But I'd like to talk about some of those observations of... Well, here's the context. I'm happy to hear your response, but I wanted to know when we look at this case based on the standard review, are we allowed to look at the denial and the testimony to say that it's reasonable that those were the facts that would support a reasonable suspicion? Or not? Well, the appellate court reversed the trial judge's findings, Your Honor, and found that there was no reasonable suspicion for that. And I believe that this is still a mixed question of fact and law here that I think that Your Honors could consider de novo. I don't think that the office... And I don't mean to represent the trial judge's order, suppression order, but I don't believe he made those factual findings, Your Honor. Thank you. Is it your position, Mr. O'Neill, that it wasn't reasonable because there was no connection between the facts known and observed and the place searched? Is that part of your argument? Well, that's an important part of my argument, Your Honor. I think it's a large stretch and beyond a reasonable suspicion standard to find that because the defendant was acting erratically or nervously or perhaps even... I'll even go as far as... Let's say that there was some type of a suspicion that he was under the influence of drugs at the probation office. It doesn't necessarily follow for reasonable consideration that he stored a stash of drugs at his residence. There's no connection between the fact that he may have been under the influence of drugs at the probation office and had a stash of drugs at his house at 10 o'clock at night when the observation occurred in the morning. He could have... A reasonable inference is that he could have, I don't know, taken drugs before he walked into the probation office. That doesn't necessarily... That doesn't mean that he... or establish any reasonable suspicion that he has drugs stashed in his home. Were there facts sufficient to search his person? Well, I do not believe so, Your Honor, because I don't... There is certainly the probation officer... Well, to put it this way, the probation officer could have followed up on and asked Apsher questions and tried to further narrow his observation and asked him perhaps... asked him to submit to the search of his person. But I want to emphasize that those observations were still very weak as far as a reasonable suspicion. The probation officer, Chester, with the record does not establish that he had any type of training or significant experience in discerning the symptomatic effects of cocaine. He was a... His expertise from the record was he was a platoon leader in the Marines and he was a youth program coordinator or something along those lines. So I don't think that he sufficiently had the qualifications to make that type of a determination. It certainly lessens the reasonableness of his conclusion. And there's... I don't have enough time, but there's... Lapitoque is a controlling case here and I think that the cases that were decided after Lapitoque versus Wilson and People versus Moss, which were parolee cases, also are very important because those cases in distinguishing the difference between parole and probation clearly have found that the probation is a mild and ambulatory punishment that is appropriate when the offender is not a threat to the community. That dissipates the reasonableness of a suspicionless search. Also these cases, these courts found that a degree of privacy and autonomy is inherent in the probationer's status. So these cases are germane to... These parole cases are germane to considering the differences between parole and probation and finding that probationers maintain a constitutionally protected right to privacy and that a search of a probationer as opposed to a parolee is unreasonable under... A suspicionless search of a probationer is unreasonable under the Fourth Amendment. There are other facts. The statutory code, the Unified Code of Corrections, also in distinguishing parolees from probationers, requires parolees to consent to a search. So that is part of every parolee's conditions. But it requires only that a probationer permit a probation officer to visit him at his house in order to have the probation officer perform his duty in monitoring the probationer. Thank you, Your Honors. In conclusion, I ask this Court to affirm the appellate court's ruling. Thank you, Your Honors. Justice Tice, the language you quoted from the probation agreement, from the search condition where the defendant agreed to consent to the admission of any evidence seized in court, was an explicit waiver of his rights under the exclusionary rule and would make absolutely no sense if the condition itself was not a waiver of his Fourth Amendment rights. Have you seen that language in other cases? I'm not, well, I don't know. I know it was not in, this Court did not mention it in Lampetot, so I don't know if it was in that condition or not. But I do know that there has to be some meaning to a term like that. And if it doesn't mean that it was a waiver of Fourth Amendment rights, it really was superfluous. I think the defendant's argument here would essentially cut the legs out from under the probation system. If a probation officer is not allowed to act on the information that he knows and with an understanding of the probationer who he's charged with overseeing, with that probationer's background and history, if he's not allowed to act swiftly to uncover evidence of probation violations or other criminal violations or even any manner that any sort of activity that would undermine the probationer's rehabilitation potential, it severely undermines the probation system. Mr. Levin, then what was the specific purpose to this search which made it related to a probation purpose and not law enforcement? I think that's what Mr. O'Neill was arguing. Yeah, well, first of all, there's no indication in the record that this was a ruse and that the probation officers were acting solely at the behest of law enforcement. In fact, the testimony was exactly the opposite. The decision to search in this case was made by the probation office. After observing the probationer at the probation office for one of his scheduled meetings, they felt the need to search him and they then for logistical reasons, of course, bring in law enforcement officers to a search with the system. I mean, going out into the field and searching somebody's home, especially here where you have a probationer who then would not allow the search and did not live up to his end of the agreement, it can be a dangerous situation. And so to bring in law enforcement officers doesn't turn the search from a probation search into a law enforcement search. This was a search at the direction and at the behest of the probation office and there's no indication that it was for any reason other than pursuant to the probation itself. How do you address Mr. O'Neill's argument that County A can call something intensive probation and County B can call it regular probation and same exact conditions apply and County B would be subject to lamp attack and County A would not just by the mere nomenclature of intensive probation? The nomenclature doesn't matter. What matters are the conditions. What matters is how diminished by reason of those conditions is the probationer's reasonable expectation of privacy. And so I discussed before and we sort of got into this, well, does it have to be a case-by-case basis? And I would just like to clarify that obviously at its core, it is a case-by-case analysis. And even in Sampson it had to be a case-by-case analysis. Just because a state calls something parole, if they didn't attach to that parole a search condition, we wouldn't have had Sampson versus California. So obviously it requires a court to look at the conditions.  So regardless of what it's called, if the conditions of probation intensive or otherwise are very similar to the conditions of parole, that would put it outside of the lamp attack analysis. Yes. And to be even more specific, if the conditions of probation include a search condition which requires the probationer to submit to searches without reasonable suspicion and to then waive his rights under the exclusionary rule, if you have a search condition like that, you're in intensive probation supervision. That's essentially the hallmark of intensive probation supervision is a condition that allows the probation officer to closely supervise his charge. So while lamp attack in this sense can be distinguished on the grounds that not only was it not talking about the term intensive probation supervision, there's no indication that there was this waiver of the exclusionary rule in that case. There was a search condition, though. There was a search condition. And just focusing on that, you're saying that that's the key. It's not these other conditions. You know, the probationer should not associate with convicted felons or drug testing. Are we looking at those factors? What should we look at? The key point is the search condition. Obviously those other conditions are evidence of just how restrictive the probation is. But the search condition is what allows the probation officer to carry out those other conditions and to make sure that the probationer is living up to those conditions. So the key fact, both in the parole cases and in the probation cases, is the existence of the search condition. But, again, that's basically what Barnett held. Well, Barnett was purely decided under the waiver theory. So it would not address, it didn't address whether the search was even absent a waiver, whether the search would have been proper under general Fourth Amendment balancing or under the special needs doctrine. Barnett was purely based on the theory that the defendant here waived his Fourth Amendment rights. And in that respect, it's true that Lopatak did hold that the language of a condition like this, that defendant shall submit to a search, was not a prospective consent to that search, because when the time came, the defendant, of course, still had the ability to say, no, I'm not going to let you search. Would the U.S. Supreme Court and Samson agree with your distinction based on intensive probation? They did draw this distinction between parolees and probationers, right? They did, but the distinction they were drawing was just between a generic parole and a generic probation. There's no indication that they were analyzing any specific type of probation. I think what's important is to go back to Griffin, where the Court did note that even probation itself can range from the less confining to the more confining. And what was important in Samson was that the Court looked at the conditions to which the parolee was subject and concluded from those conditions that the defendant's expectation of privacy was virtually nil. And I think they would come to the exact same result in this case if they were to analyze the absure's conditions of probation. So you think that Supreme Court was unaware of different conditions in probation when they drew a line between parolees and probationers? I don't think they were unaware of the differences in probation, but I think they were trying to make the point that parole is different than just some sort of general probation. And I think they would make the same point in this case that an intensive probation supervision, including all of these search conditions, is itself different from an ordinary case of probation. Briefly on the special needs point, I would just mention that under the special needs doctrine, the courts don't consider whether any particular search itself was supported by individualized suspicion. That's the case in the border search cases, in the drunk driver search cases, in Illinois v. Lidster, where the court upheld suspicionless searches of motorists to search for information about a crime. In none of those cases was there any reason to believe that the particular person stopped was engaged in wrongdoing. What the special needs doctrine asks, and the first question under the special needs doctrine is, is there a special need beyond normal law enforcement? And I think everybody concedes that probation does present that type of special need. If there is a special need of law enforcement, the question is then, after balancing the intrusion on the individual's privacy against the degree to which the search is needed to meet that special need, whether the program itself is reasonable. And that's why the court upheld the search in Griffin. That's why the courts upheld searches in Illinois v. Lidster, in Michigan v. Sitz, in Martinez-Fuertes, across the fact that the probationer's reasonable expectation of privacy was severely diminished, if not completely extinguished. And on the other hand, the overwhelming need of the state to closely supervise such probationers, a suspicionless search condition is reasonable under the Fourth Amendment. And there's good reason to have a suspicionless search condition rather than a search based on reasonable suspicion. The court talked about this in Sampson and in Knights. A high-risk probationer who knows that if he violates his probation, he's most likely going to prison, has a great incentive to conceal his criminality, to destroy evidence, to basically thwart the probation system. And the defendant's argument would force probation officers to take the same steps in dealing with their probationer that an ordinary law enforcement officer would take in simply investigating a general crime. And that would severely undermine the purposes of the parole system. We'd ask the court to reverse the judgment of the appellate court and affirm the conviction entered by the trial court. Thank you. Thank you. And before I close this case, I know that the eighth grade students are going to, I believe, leave. Is that correct? I'm sure you found these arguments extraordinarily exciting. Or maybe not. But we're delighted that you are here. And so when you go home tonight, tell your parents, tell your friends, tell your aunts and uncles that you witnessed history in the making today. This is the first time in the history of the Illinois Supreme Court when seven members were comprised with three women on the court. Justice Rita Garman, Justice Ann Burke, and Justice Mary Jane Tice. So if you weren't excited today, at least maybe you can be excited when you go home tonight. Thank you. Thank you.